378 P.2d 482

**Eliza Ridd EGBERT, Petitioner,**

**v.**

**The INDUSTRIAL COMMISSION of Arizona and Monarch Swimming Pool Equipment Company, Inc., Respondents.**

**No. 7692.**

**Supreme Court of Arizona,
En Banc.**

**Feb. 6, 1963.**

Herbert B. Finn, and Lawrence J. Sandell, of Phoenix, for petitioner.

Lorin G. Shelley, Phoenix, for respondent Industrial Commission of Arizona; Donald J. Morgan, C. E. Singer, Jr., Ben P. Marshall, Laurence Davis, Phoenix, of counsel.

JENNINGS, Justice.

Petitioner, Eliza Ridd Egbert, seeks by writ of certiorari to set aside an award of the Industrial Commission (hereinafter called Commission) on the ground that the findings and award of the Commission are not supported by the evidence.

Petitioner was employed as a bookkeeper by Monarch Swimming Pool Equipment Company, Inc. On November 18, 1960 she sustained an injury to her hip. The injury occurred as petitioner turned in her office chair and bumped her toe on the leg of the desk thereby causing her to twist her hip. The injury aggravated a pre-existing condition of arthritis of the right hip joint.

On February 15, 1962 the Commission made and entered its Findings and Award

For Scheduled Permanent Disability finding in part:

"1. That the * * * applicant on November 18, 1960 sustained a personal injury by accident arising out of and in the course of his [sic] employment.

\*　\*　\*　\*　\*　\*

"3. That said personal injury entitles said applicant to accident benefits (medical) until February 1, 1962.

\*　\*　\*　\*　\*　\*

"6. That said applicant is entitled to compensation for total temporary disability from April 28, 1961 through February 1, 1962 in the sum of $2,074.13.

"7. That said injury caused also a permanent partial disability equal to 10% loss of function of the right leg, and entitles said applicant to compensation therefor in the sum of $173.32 monthly for a period of 5 months."

The findings and award were affirmed on rehearing on July 3, 1962.

Petitioner disputes only finding No. 7 wherein the Commission found petitioner had a permanent partial disability equal to a 10% loss of function of the right leg. She contends that such finding is not supported by the evidence. The finding was

based upon the doctors' consultation report of January 18, 1962 [1] wherein it was stated:

"After review of the file and physical examination today the consultants are of the opinion that the patient's condition, with reference to the accident of November 18, 1960, is now stationary, requires no further treatments or examinations, and that as a result of the aggravation of a preexisting degenerative disease of the right hip by the injury in question, the patient has a permanent partial disability equivalent to approximately 10 per cent functional loss of the right leg."

In determining the amount of compensation to be paid for the partial loss of use of a leg, A.R.S. § 23–1044, subd. B provides in pertinent part:

"15. For the loss of a leg, fifty months.

\*     \*     \*     \*     \*     \*

"21. For the partial loss of use of a \* \* \* leg, \* \* \*, fifty per cent of the average monthly wage during that proportion of the number of months in the foregoing schedule provided for the complete loss of use of such member \* \* \* which the partial loss of use thereof bears to the total loss of use of such member \* \* \*."

Although an injury to the hip is not classified and specifically compensated under A.R.S. § 23–1044, subd. B, it is compensable as an injury to the leg. Ujevich v. Inspiration Consolidated Copper Co., 44 Ariz. 16, 33 P.2d 599 (1934). The term "partial loss of use" (as set forth in A.R.S. § 23–1044, subd. B (21)) refers to a percentage of physical functional disability rather than to a proportional loss of capability of the injured employee to perform the work previously done by him. Weiss v. Industrial Commission, 87 Ariz. 21, 347 P.2d 578 (1959).

In explaining the consultation report of January 18, 1962, Dr. Bishop testified as follows:

"Q  Doctor, in the January consultation you arrived at an opinion, that is, you and Dr. Lofdahl and Dr. Edwards arrived at an opinion as to the disability that Mrs. Egbert had sustained as a result of this injury?

"A  Yes, sir, we did.

"Q  Would you tell us what the percentage was that you arrived at?

"A  It was our opinion that as a result of the aggravation of this pre-existing condition that she had approximately a 10 per cent functional loss of the right leg.

1. The doctors participating in the consultation were W. A. Bishop, Jr., C. M. Lofdahl and W. V. Edwards.

There are no means in the Workman's Compensation Act [sic] to put the disability to the hip where it actually is. So it had to be placed with reference to the leg on the side involved.

"Q Could you tell me what standards you used in arriving at this particular conclusion?

"A You use a number of standards. No. 1 is the degree of limited motion that is present. No. 2 is the type of X-ray changes present and the type of disease process present. No. 3 is the type of trauma and the degree of trauma when talking about an aggravation of a pre-existing condition."

As to the manner and method he used in arriving at the percentage of disability Dr. Bishop testified that:

"The figures with reference to various instability in an extremity have to be on the basis of interpolation. If we could confine this to a hip and talk about the hip only, because that is the part of the leg that is actually involved, then it would be much easier. But as I said a while ago there is nothing in the law that deals with the hip. For practical purposes the extremity in so far as our arriving at a disability of a particular joint, it is divided into sections. For example, the ankle or the region about the knee and the region about the hip, each constituting approximately a third. In our way of thinking and in our interpolation this figure would represent approximately a 30 per cent loss of function in her hip. In other words, three sections to the extremity, her disability is limited to the hip. Ten times three is 30. That is the basis of interpolation that we use in trying to arrive at a disability where a joint affects an extremity."

Dr. Lofdahl testified as to the method he used in arriving at the percentage of disability as follows:

"After examination and taking a look at her X-rays and figuring her hip as one-third of the leg, why, she probably has around 30 degrees loss of function in the hip joint itself as an entity. Then given on the whole lower extremity which they call the leg it would reduce it to about 10 percent."

The Commission may adopt the findings of medical consultants in determining the loss of function or use of a particular extremity, Shaw v. Salt River Valley Water Users Ass'n, 69 Ariz. 309, 213 P.2d 378 (1950). In Shaw the Commission accepted the findings of the examining medical board that petitioner suffered a 10% functional disability to his left (minor) arm. Although the Court agreed

with petitioner that the medical experts' finding of a 10% functional disability was more or less arbitrary it stated that:

"* * * there was in fact no objective findings of any functional disability other than as stated by Dr. Moore, 'a difference in the symmetry of the size of the extremities (of petitioner's right and left arms) which could reasonably be attributed to the injury.' They all stated that this percentage of functional disability was based largely upon the complaint of petitioner that he suffered pain in the area of the shoulder and left chest.

"The record discloses that the Commission in adopting the findings of the examining medical board * * * resolved every reasonable doubt in favor of petitioner * * *." 69 Ariz. 312, 213 P.2d 380.

Although the Commission may adopt the findings of medical consultants, medical *opinion* alone is not enough upon which to base an award. Hemphill v. Industrial Commission, 91 Ariz. 322, 372 P.2d 327 (1962). The medical evidence upon which an award is based must consist of findings of medical facts concerning the condition of the petitioner. Hemphill v. Industrial Commission, supra; McAllister v. Indus-

trial Commission, 83 Ariz. 213, 319 P.2d 129 (1957); Tashner v. Industrial Commission, 62 Ariz. 333, 157 P.2d 608 (1945).

In the case at bar petitioner was examined in consultation on June 15, 1961 by Drs. Bishop and Edwards.[2] At that time they concluded:

"The patient has at the present time a *marked degree of disability* as a result of the difficulties with the right hip, is unable to go on with gainful occupation at this time and her condition is not considered stationary." (Emphasis supplied.)

Dr. Bishop reported to the Commission on August 31, 1961 that petitioner was not improving significantly, still had *marked limitation of motion* and pain in the right hip and was walking on crutches.[3] On September 22, 1961, Drs. Alvin L. Swenson, Malcolm F. Dorfman and James R. Moore saw petitioner in consultation. At that time the doctors stated in their report that:

"Her condition has progressed to the point where her symptoms are not completely or permanently relieved by conservative measures.

"In view of the fact that the symptoms of aggravation following the accident of November 18, 1960 have been con-

---

2. Petitioner was first seen by Dr. J. N. Wahlrab on November 18, 1960. He treated her until June 15, 1961 (date of the first consulation) after which time she was treated by Dr. Bishop.

3. Dr. Bishop put petitioner on crutches as soon as he started treating her. Her condition subsequent to that time never improved sufficiently to enable her to discard the crutches.

tinuous and progressive, it would appear that recovery from the effects of that accident has not yet occurred and that further, more radical measures may be required.[4]

"Since the patient continues to have symptoms requiring the use of crutches, she would be considered disabled for work except under special circumstances and conditions."

Petitioner failed to respond to treatments of a conservative type and surgery was therefore recommended. Inasmuch as only a "fair result" could be achieved from surgery, petitioner decided against it.[5] Therefore, the final consultation was held on January 18, 1962.

Dr. Bishop testified that petitioner's condition was essentially the same at the time of the last consultation on January 18, 1962 as it was at the first consultation on June 15, 1961. He also stated that "anything that we tried to do for her from the time * * * [he] first saw her * * * up to the time her case was closed, nothing except pain pills helped her. * * * In fact, her condition and her complaints were much worse when she was discharged than they were when she was transferred to me for treatment." It was his opinion that there would be no improvement in peti-

tioner's condition. He also testified that petitioner could not balance herself as well as a normal person; that she was limited in lifting and carrying; that she had more difficulty than a normal person in getting up or sitting down; that she would have difficulty getting down to and up from a kneeling position; that she could not squat in a normal fashion; and that her hip movements would be more awkward and clumsy than normal. Dr. Lofdahl's testimony with reference to the effect petitioner's injury would have on these activities was as follows:

"Q Doctor, isn't it true that normally in determining a loss of functional use of a leg which includes the hip joint that you have to take into account let's say something like balancing, the patient's ability to balance?

"A Well, the function of the hip joint itself is what we are really after from a physical point of view. Other things enter into it. Functional loss of a finger for a violin player is more of a functional loss than the loss of a finger for a janitor. From a physical point of view the actual hip joint itself is what we are concerned with.

---

4. They indicated that some type of arthroplasty might be required on the right hip depending upon the further progress and degree of functional impairment.

5. The operation would have involved the substitution of the dead or diseased head in the socket of petitioner's right hip with that of a metal head.

"Q  *  *  *  would you have to examine a hip and the leg with respect to this patient's ability, let's say, to balance herself, to lift, to twist, to turn, to pivot and to spring?

"A  Yes.

"Q  To get up and sit down, let's say?

"A  Right.

"Q  Get up and lie down?

"A  Yes.

"Q  To squat and that sort of thing?

"A  Yes.

"Q  Isn't it true that when making this judgment of a 10 per cent loss that you were really referring here to the actual loss in the physical motion of the hip?

"A  Yes.

"Q  Rather than its effect on her ability to do any of these things?

"A  If she had an IBM machine, you could figure all that out. But if you are going to figure out every little physiological entity the individual has—but we can't. We have to reach a gross figure basing the hip on about a third of the leg.

"Q  Did you perform all of the things that you would normally do in determining the loss of motion of the hip in this examination?

*    *    *    *    *    *

"A  *  *  *  The motions were not actually done. She was beginning to do it and it caused pain.

*    *    *    *    *    *

"Q  *  *  *  The pain seemed to be of such severity that the examining doctors didn't want to proceed with some of the usual forms of examining the limitations of action on the hip, isn't that correct?

"A  Yes. Just taking a look at the X-ray, why, in a hip like this you know that a person is going to have pain on doing certain things, so there is no point in doing them.

*    *    *    *    *    *

"Q  Do you think her condition will improve with respect to the pain?

"A  You mean in time?

"Q  In time.

"A  No, not very likely. With an X-ray of a person with that type of a hip, the hip joint itself never gets any better."

Petitioner is 53 years old and is not trained for any type of work other than bookkeeping. In answer to the question as to what limitations this condition imposed upon her activities she stated "I don't stoop. I can't lift. I can't sit. I can't walk without pain." She said that her

condition, instead of getting better, seemed to be getting worse.

■ It is apparent from reading the record and the reporter's transcript of the proceedings that the Commission, in finding that petitioner suffered a 10% loss of function of the right leg, failed to consider anything other than the medical opinion contained in the report of January 18, 1962. Although the Commission may adopt findings of medical consultants they cannot base an award on medical opinion alone, especially when such opinion is not supported by the evidence. Hemphill v. Industrial Commission, supra; McAllister v. Industrial Commission, supra; Tashner v. Industrial Commission, supra. In view of the facts concerning the condition of the petitioner, we do not think that it necessarily follows that "a thirty per cent disability of the hip amounts to a ten per cent disability of the leg since the hip is one-third of the entire leg." A.R.S. § 23–1044, subd. B requires that compensation for the partial loss of use of a leg be based on "loss of use." The evidence in the record does not substantiate the finding of the Commission as to the percentage of loss of use of the petitioner's leg. It indicates that the disability is much greater.

The award is set aside.

CHARLES C. BERNSTEIN, C. J., UDALL, Vice C. J., STRUCKMEYER and LOCKWOOD, JJ., concur.