716 P.2d 32

Antonio GOMEZ, Petitioner Employee,

v.

The **INDUSTRIAL COMMISSION OF ARIZONA**, Respondent,

American Consolidators,
Respondent Employer,

the Home Insurance Company,
Respondent Carrier.

No. 1CA–IC3130.

Court of Appeals of Arizona,
Division 1, Department A.

May 14, 1985.

Thomas E. Johnson, Tucson, for petitioner Employee.

Sandra A. Day, Chief Counsel, Phoenix, for respondent Industrial Com'n of Arizona.

Bury, Moeller & Humphrey, P.A. by J. Michael Moeller and Marshall Humphrey, III, Tucson, for respondent Employer and respondent Carrier.

## OPINION

HAIRE, Presiding Judge.

In this workers' compensation proceeding, the administrative law judge issued a scheduled award for a 30% loss of use of claimant's left leg. On review in this court the claimant has raised two issues. First, he contends that an altered gait caused by his leg injury has aggravated an arthritic condition in his back, and that because of this causally related back injury an unscheduled award should have been entered. Alternatively, he contends that if the record provides support for the administrative law judge's determination that the back condition was not causally related to the leg injury, then the administrative law judge should have issued a scheduled award for a 100% loss of use of his leg, or at least for an amount substantially in excess of 30%.

We first consider whether the administrative law judge erred in rejecting claimant's contention that his back condition was causally related to the leg injury. It is well established that it is the function of the administrative law judge to resolve conflicts in the medical evidence, including questions involving credibility and bias, and that we may not substitute our view of the evidence for that of the administrative law judge. *Perry v. Industrial Commission,* 112 Ariz. 397, 542 P.2d 1096 (1975); *Lazarin v. Industrial Commission,* 135 Ariz. 369, 661 P.2d 219 (App.1983). If there is any substantial evidence to support the administrative law judge's factual findings, we must affirm his determination. *Perry; Greenlaw Jewelers v. Industrial Commission,* 127 Ariz. 362, 621 P.2d 49 (App.1980). Without going into evidentiary detail, our review of the record reveals substantial evidence through the testimony and report of Dr. John Cortner to support the administrative law judge's finding that claimant's back problems were not causally related to claimant's altered gait resulting from his leg injury. Although we might have resolved the conflicting medical evidence in favor of claimant, we cannot say with any degree of objectivity that the administrative law judge's resolution of this issue was not supported by substantial and competent evidence. Accordingly, we reject claimant's first issue.

Claimant's second issue brings sharply into focus the interpretation to be given in scheduled injury cases to the Arizona Supreme Court's decision in *Dutra v. Industrial Commission,* 135 Ariz. 59, 659 P.2d 18 (1983). Although both medical witnesses in this case agreed that claimant had sustained a 30% impairment of function of his left leg when rated in accordance with the American Medical Association's "Guides to the Evaluation of Permanent Impairment," and that in this case the guides provided an adequate measure of claimant's actual functional impairment of his left leg, claimaint urges, based on *Dutra,* that he should have been given an award for a 100% loss of use of his leg because of the effects of the injury on his ability to return to his former employment.

Before proceeding further, we must acknowledge that one of the greatest difficulties which this court has faced in considering this *"Dutra"* issue has been to analyze *Dutra* and determine its application to the facts presented without unduly criticizing what this court considers to be an extreme

departure from prior Arizona statutory and decisional law. We note that in *Dutra* the Arizona Supreme Court acknowledged that its holding "appears to be contrary to two previous cases of this court," 135 Ariz. at 62, 659 P.2d 18, citing *Egbert v. Industrial Commission,* 93 Ariz. 33, 378 P.2d 482 (1963) and *Weiss v. Industrial Commission,* 87 Ariz. 21, 347 P.2d 578 (1959). This is a dramatic understatement of the impact of *Dutra* on the administration of Arizona's workers' compensation law. Perhaps the Arizona Supreme Court did not realize the extent of *Dutra's* departure from prior decisional law and its inconsistency with the Arizona statutory scheme governing scheduled injuries. In fact the opinion is directly contrary to the basic rationale of not two, but of countless prior Arizona Supreme Court and Court of Appeals decisions dealing with scheduled injuries. It is also contrary to the basic statutory scheme which has governed the disposition of scheduled injuries as opposed to unscheduled injuries since the Arizona workers' compensation law was enacted in 1925.

For this reason we find it necessary to engage in an extended analysis and discussion of that opinion, at times critical, but at all times with due respect for the fundamental principles that govern the relationship between this court and the Arizona Supreme Court in Arizona's system of appellate review.[1]

It appears that the basic holding of *Dutra* is that in determining the percentage of loss of use of a member pursuant to A.R.S. § 23–1044(B), consideration must be given to the effect the impairment has on the worker's subsequent ability to perform the employment the worker was engaged in at the time of the injury. This is not the first time that contention has been considered by the Arizona court. *See Egbert* and *Weiss, supra.* In *Smith v. Industrial Commission,* 69 Ariz. 399, 214 P.2d 797 (1950), the Arizona Supreme Court held that this contention was contrary to the provisions of § 56–957, A.C.A. 1939 (now A.R.S. § 23–1044). In *Smith,* the claimant had injured her wrist and contended that she had a disability much greater than the 5% loss of function which had been awarded by the Commission. She argued that the Commission had committed error in failing "to consider the ... nature [of her injury] in relation to her occupation." 69 Ariz. at 400. This is the same argument advanced in *Dutra.* The *Smith* court quoted § 56–957(d), A.C.A 1939 (now A.R.S. § 23–1044(D)), which allows the Commission to consider "the occupation of the injured employee" and "the nature of the physical injury." The *Smith* court pointed out, however, that § 56–957(d) was, by its own terms, applicable to *unscheduled* injuries only, and that the Commission "was compelled to make its award according to the law applicable to a scheduled injury as defined by our legislature, and to change that, resort must be had to that body."

We note that the statutory scheme governing scheduled and unscheduled injuries presently embodied in A.R.S. § 23–1044 has not materially varied from that discussed in *Smith.* A.R.S. § 23–1044(D) at the present time allows consideration to be given to "the type of work the injured employee is able to perform subsequent to the injury," but, consistent with the holding in *Smith,* consideration of such evidence is *statutorily* limited to "the purposes of subsection (C) [unscheduled injuries]."

Similarly, under A.R.S. § 23–1044(G)(1), the employee may present evidence "showing that the inability to obtain suitable work is due ... to ... limitations resulting

---

1. One of the proper functions of an intermediate appellate court is to voice criticism of existing law. *See* Rule 28(b)(3), Arizona Rules of Civil Appellate Procedure. This opinion is not to be taken, however, as an endorsement of the scheduled injury concept as embodied in Arizona's workers' compensation statutes. To the contrary, we believe there is need on the legislative level for substantial revision of the scheduled injury concept in order to provide more realistic compensation to the many claimants whose "scheduled" injuries have resulted in earning capacity disabilities far in excess of the maximum compensation now allowed under our statutes for scheduled injuries.

from the injury," but again this subsection is expressly limited to cases involving subsection (C) (unscheduled injuries) and (E) (unscheduled successive injuries). Application of this provision to subsection (B) scheduled injuries would be contrary to the terms of the statute.

A further indication that *Dutra's* holding is contrary to Arizona's statutory scheduled injury concept is found in the provisions of A.R.S. § 23–1044(H), which provides that "[A]ny single injury or disability listed in subsection B ... shall be treated as scheduled under subsection B of this section *regardless of its actual effect on the injured employee's earning capacity.*" (Emphasis added). In *Dutra* the court stated: "Compensation then for a scheduled injury is made solely with reference to the salary the workman was receiving at the time of the injury." From that premise the *Dutra* court somehow concluded that the "[i]nability to perform the claimant's particular job at the time of his injury must be considered in determining" the extent of his compensation. 135 Ariz. at 62. While the court's reasoning in *Dutra* is far from clear, it is evident that its rationale involves to some extent a consideration of the effect of the scheduled injury on the claimant's earning capacity in his former employment. This contradicts the statutory mandate of A.R.S. § 23–1044(H) which requires that the actual effect of a scheduled injury on a claimant's earning capacity, whether in his former occupation or otherwise, be disregarded.[2]

*Dutra* does not address these statutory provisions governing scheduled injuries. The only case authority which *Dutra* cites in support of its holding that inability to perform the claimant's particular former employment must be considered in determining the worker's scheduled disability is

*Boyce v. Sambo's Restaurant, Inc.,* 44 Ore.App. 305, 605 P.2d 1213 (1980). *Dutra* states that the Oregon Court of Appeals "sustained the referee's conclusion that a greater percentage of loss of use was justified where the physical injury *inhibits the claimant in performing his former employment."* (Emphasis added). This mischaracterizes the Oregon court's holding. The Oregon court's opinion in *Boyce* says absolutely nothing about the effect of the injury on the performance by the claimant of the duties of his former employment. In fact, the duties of the claimant's former employment were not even discussed in the *Boyce* decision.

*Boyce* involved a determination of the percentage of loss of use a claimant was entitled to as a result of a partial loss of use of his hand due to a thumb injury. The workers' compensation board had reduced the referee's award from an amount based on a 40% loss of use to an amount based on a 15% loss of use. Although the basis for the board's reduction of the referee's award is not set forth in the decision, it can be inferred that the board had refused to consider the claimant's loss of use resulting from a loss of strength in the thumb due to pain whenever pressure was exerted in a grasping motion. The Oregon court reinstated the referee's report, concluding that when the measurement of strict mechanical impairment of function does not adequately correlate with the extent of the true loss of use, other factors (in *Boyce* loss of strength due to pain on pressure) are relevant. The decision does not relate compensation in a scheduled injury case to the claimant's former occupation, but rather attempts to arrive at a more accurate and complete measure of loss of use. That is precisely the approach this court endorsed in its opinion in *Dutra*[3] which was

---

**2.** Admittedly, A.R.S. § 23–1044(H) concerns the unscheduling of scheduled injury claims. However, it directly indicates a legislative intent that in scheduled injury cases, the effect on the claimant's earning capacity is immaterial.

**3.** In this court's opinion in *Dutra* we approved the administrative law judge's conclusion that Dutra's loss of use of his arm could not be

adequately measured solely by the American Medical Association's Guides because the guides did not address the measurement of Dutra's loss of strength in his arm. Accordingly, we approved the administrative law judge's admission of expert testimony relating to Dutra's loss of arm strength resulting from the injury, and the award by the administrative law judge of an

subsequently reversed by the supreme court purportedly on the strength of *Boyce.*

This court also stated in *Dutra* that awards in scheduled injury cases were to be viewed "in terms of abstract physical impairment...." Based upon the law established in numerous prior decisions in Arizona, this statement was undoubtedly correct as applied to physical impairments which fall within the rating schedule adopted by the Commission for the rating of physical impairments. However, it is clear from the balance of our opinion in *Dutra* that we recognized that when an impairment does not fall within the guides for rating adopted by the Commission, then the percentage of impairment could not actually be considered in the "abstract," but rather must then be based upon the effect of the impairment on the "everday use of the arm" and not restricted, as the claimant in *Dutra* claimed, to the loss of use in the worker's specific occupation.[4]

In considering the above concept of loss of "everyday use of the arm," it is evident that such an indefinite standard would inevitably lead to great disparity in amounts awarded by different administrative law judges considering substantially identical physical impairments. Our legislature has foreseen the possibility of such inequities and in an attempt to standardize to some extent the compensation to be awarded for substantially identical injuries, has enacted A.R.S. § 23–1044(G) as a part of our workers' compensation act authorizing the Industrial Commission to adopt a schedule for the rating of disabilities. Accordingly, the Commission has enacted a procedural rule, A.C.C.R. R4–13–113(D)[5], which adopted the American Medical Association's "Guides to the Evaluation of Permanent Impairment" for determining the percentage rating of functional impairment.

The percentages established in these guides are to be considered conclusive for rating specific impairments which fall within their provisions, but are not conclusive when there is medical evidence that the guides do not adequately cover the specific impairment. *Smith v. Industrial Commission,* 113 Ariz. 304, 552 P.2d 1198 (1976); *Adams v. Industrial Commission,* 113 Ariz. 294, 552 P.2d 764 (1976). These guides assume particular importance when a scheduled injury is involved. As stated by Justice Hays in *Smith, supra:*

> "The percentage of impairment is relatively unimportant for unscheduled injuries since it is only one of several factors to be considered in arriving at a permanent disability. A.R.S. § 23–1044(D). The amount of compensation is determined by the claimant's reduction in earning capacity. A.R.S. § 23–1044(C). *In the scheduled injury area the percentage of impairment is all-important since the legislature has translated the percentage into a fixed rate of permanent disability.* A.R.S. § 23–1044(B)." 113 Ariz. 307, n. 4, 552 P.2d 1198. (Emphasis added).

additional percentage of loss of use based solely on the loss of function resulting from the loss of strength. The administrative law judge's allowance of an incremental percentage for loss of use based on the loss of strength thus created a difficult decisional problem of quantifying a specific percentage attributable to the loss of strength. Since his decision fell within the parameters of the percentage evidence presented to him on this issue, we found no abuse of discretion and affirmed his award. *Dutra v. Industrial Commission,* 135 Ariz. 86, 659 P.2d 45 (App.1982).

4. By the use of the term "everyday use of the arm" in this court's opinion in *Dutra,* we did not intend to establish a legal standard for future use. Rather, our intent was to illustrate that the concept of loss of use could not be restricted to a specific employment as urged by the claimant.

5. A.C.C.R. R4–13–113(D) reads as follows:

> "D. If upon discharge from treatment the physician finds that the employee has sustained an impairment of function as the result of the injury, he shall so state in his report. *Any rating of the percentage of functional impairment shall be in accordance with the standards for the evaluation of permanent impairment as published by the American Medical Association in 'Guides to the Evaluation of Permanent Impairment'.* It shall include a clinical report in sufficient detail to support the percentage ratings assigned." (Emphasis added).

The *Dutra* decision, then, is a substantial departure from prior Arizona law in that it interjects into the process of determining the percentage in loss of use caused by a scheduled injury considerations which have traditionally been rejected as improper. By requiring consideration of the effect of the injury on the worker's ability to perform prior employment, it blurs the formerly sharp distinction between the calculation of awards for scheduled and unscheduled injuries.

An analysis of the reasoning set forth in the *Dutra* opinion does not reveal any logical rationale for the result reached. The court stated that the reasoning of the Oregon Court of Appeals was worthy of adoption, but that decision does not even discuss the principle for which it is cited, that in scheduled injury cases compensation must be based on a consideration of the extent to which the physical injury inhibits a claimant in performing his former employment.

Looking elsewhere in the supreme court's opinion in *Dutra*, we find the following:

"It is to be noted that as to scheduled injuries, the payment for loss of use is based exclusively on the amount of wages the workman was receiving at the time of the injury, A.R.S. § 28–1044(B), and for which premiums were paid, whereas in an unscheduled award, the payment is based upon the difference between the wage at the time of the injury and the workman's earning capacity after the injury. A.R.S. § 23–1044(C). Also, in scheduled injuries, payments are for a limited period of time, A.R.S. § 23–1044(B), and not for the period of disability as is the case in unscheduled injuries as provided in A.R.S. § 23–1044(C). A third distinction is that although an unscheduled award may take into account other employment available to the workman in his disabled condition, *Weidmaier v. Industrial Commission,* 121 Ariz. 127, 128–29, 589 P.2d 1, 2–3 (1978), a scheduled injury is compensated without regard to what other employ-

ment may be available. A.R.S. § 23–1044(B); *see Alsbrooks v. Industrial Commission,* 118 Ariz. 480, 481–82, 578 P.2d 159, 160–61 (1978)." 135 Ariz. at 61, 659 P.2d 18.

It is not apparent how the foregoing quotation justifies the court's immediately following conclusion that compensation in scheduled injury cases somehow has a different and closer relationship to the claimant's former occupation than is involved in unscheduled injury cases. First, contrary to the statement of the court, compensation for scheduled injuries is not necessarily "based exclusively on the amount of wages the workman was receiving at the time of the injury." *Id.* Rather, the basis for compensation in *both* scheduled and unscheduled cases is the claimant's "average monthly wage" at the time of the injury as calculated pursuant to A.R.S. § 23–1041. This "average monthly wage" may or may not be equivalent to the amount of wages the injured claimant was receiving at the time of injury.

The other differences between the statutory treatment of scheduled injuries and unscheduled injuries noted by the supreme court appear to be correct, but furnish no logical or legal basis for the court's ultimate conclusion. Obviously, compensation for injuries pursuant to A.R.S. § 23–1044(B) is for a limited period of time and for the full statutory amount without regard to the claimant's actual loss of earning capacity (scheduled), while injuries compensated pursuant to A.R.S. § 23–1044(C) are compensated for an unlimited period of time and for varying amounts, depending upon the extent of the actual loss of earning capacity and the duration of the period of disability (unscheduled). Clearly payment for scheduled injuries under A.R.S. § 23–1044(B) is based upon a full 55% of the claimant's prior average monthly wage, whereas payment for unscheduled awards under 23–1044(C) is based upon 55% of the difference between the claimant's average monthly wage and his reduced monthly earning capacity after the injury. We are unable to fathom how these differences

furnish support for the court's conclusion. In fact, these differences show rather conclusively the legislature's intent that in scheduled injury cases the effect upon the claimant's ability to continue working in his former occupation, or any occupation, is immaterial, whereas in unscheduled injury cases, consideration must be given to the effect of the injury on the claimant's subsequent ability to work in his former occupation as well as in other occupations.

We realize that *Dutra* now constitutes the law of this state and is binding on this court. What that law is, however, is not clear. Our best interpretation of the court's holding is that the court intended that in *all* scheduled injury cases, regardless of whether the guides adopted by the Commission furnish a fair measurement of the extent of functional impairment or not, the administrative law judge must consider the effect of the scheduled impairment upon the claimant's ability to perform in his former occupation. *Dutra* furnishes no analysis as to how the administrative law judge's consideration of the claimant's inability to perform his particular job is to affect the amount of the award which would otherwise be based strictly upon the statutory standard. If the scheduled injury, even though the physical impairment constitutes a substantial percentage of loss of function, does not actually reduce the claimant's ability to perform in his prior occupation, is he therefore entitled to a lesser percentage or no award? [6] Is a 15% physical impairment which totally precludes the claimant from returning to his former occupation to be considered a total loss of use entitling the claimant to a 100% scheduled award? [7] Of course, underlying these questions is the practical problem of how the administrative law judge is to arrive at the specific percentage resulting in the ultimate award. Should the administrative law judge consider the various physical tasks required in the claimant's prior employment and from this make a determination of the lesser percentage of such tasks the claimant could now perform? Can such a percentage be extrapolated by the administrative law judge in the absence of expert opinion evidence establishing such percentages? Should the experts be medical or occupational experts? *Dutra* leaves these questions unanswered.

Turning at last to the facts of this case it is clear that the 30% functional impairment of claimant's leg precluded his return to his former employment. Accordingly, claimant argues that he should have been awarded a 100% loss of use, which we observe is equivalent to a complete loss of the leg by separation.[8] On the other hand, the carrier urges that *Dutra* does not equate an inability to perform the prior employment with a 100% loss of use. The carrier urges that all *Dutra* requires is that the effect of the injury "must be considered" by the administrative law judge, and that therefore the administrative law judge must look to what percentage of tasks the claimant can no longer do with

---

**6.** The supreme court in *Dutra* quotes language from Larson on Workmen's Compensation, § 58.13(e). We note that several cases cited by Larson in that section do hold that in "scheduled" injury cases under the statutory schemes of the particular jurisdictions involved, claimants with substantial physical impairments have been held not entitled to scheduled awards where the evidence shows that notwithstanding the physical impairment, the claimant has been able to continue to fully perform his former occupation. *See, e.g., Mid-Continent Cas. Co. v. Busick,* 353 S.W.2d 926 (Tex.Civ.App.1962); *Brewer v. Travelers Ins. Co.,* 244 So.2d 909 (La. App.1971); *Verna v. Stabler,* 204 Pa.Sup. 87, 203 A.2d 578 (1964). Prior to *Dutra* such a result would immediately be recognized as contrary to Arizona's statutory scheme. This illustrates that

although Larson's work on workmen's compensation law is of great value as a general research source, it should not be viewed as the "bible" of workers' compensation law and relied upon to the exclusion of an initial thorough consideration of the statutes and case law of the particular jurisdiction involved.

**7.** A.R.S. § 23–1044(B)(20) equates "complete loss of use" with the loss of "such member by separation." Obviously, a 15% physical impairment cannot logically be equated to a loss of the member by separation.

**8.** In speaking of how *Dutra* is to be applied, claimant states: "Admittedly there is great confusion."

his scheduled disability.[9] The carrier characterizes the evidence as follows:

"There was evidence of disability, and both doctors agreed that because of certain tasks in claimant's job, he should no longer work there. But such evidence did not support increasing the disability to beyond 30%. It was only some tasks which claimant was unable to perform—namely, driving heavy equipment due to an inability to work the clutch, and heavy lifting. [TR 1/26/83, pp. 21, 22]. Claimant still could work a full time schedule so long as no lengthy walking, squatting and climbing were involved. [TR 1/26/83, p. 9]. The question then is whether the inability to drive vehicles with hard clutches and to do heavy lifting increased claimant's disability beyond 30%. The Administrative Law Judge decided that it did not and such a decision is clearly reasonable."

After considering the arguments of the parties and the Arizona Supreme Court's *Dutra* decision, the administrative law judge concluded as follows:

"A scheduled injury which affects the applicant's return to his former employment can increase the amount of compensation as set forth in *A.R.S.* § 23–1044 B for a given disability. In the instant case there is no medical evidence as to the amount of the increased percentage of disability. It is not felt that Dr. Frankel's statement that the applicant was 100% disabled from his former employment can be extrapolated to an increased percentage of impairment. A total inability to return to your former employment is not equivalent to a total loss of use of a member. In this case unlike the factual setting in *Dutra, supra*, the medical evidence does not allow any choice within a well founded range of percentages regarding the impairment of the affected member. Without such a well founded range of impairment within which the applicant's disability might be

rated, an administrative law judge would have to engage in *sheer arbitrary speculation*." (Emphasis added).

The administrative law judge entered an award for a 30% loss of use, the percentage of physical impairment established by the medical witnesses. In reviewing this award in order to determine whether the administrative law judge has complied with *Dutra*, we are hampered by the same concerns of vagueness and indefiniteness voiced by both counsel and the administrative law judge in the record in this case. Obviously, the administrative law judge has "considered" the effect of the injury on the ability of the claimant to return to his former employment, but has found no meaningful evidence from which he could conclude that the claimant's loss of use was greater than that established pursuant to the American Medical Association Guides. In view of the confusion evidenced in the record in this case, it is apparent that some direction from the courts is essential in order to give some semblance of uniformity to the manner in which *Dutra* is to be applied in the handling of scheduled injury awards. Since the *Dutra* concept is so alien to the established statutory and decisional law of this jurisdiction, it is difficult for this court to offer definitive help in this area. However, we offer the following comments as guidance for the administrative law judges and the Bar until such time as the supreme court may give further guidance in this area.

 In our opinion *Dutra* does not authorize a reduction of the percentage of impairment established pursuant to the American Medical Association Guides for a scheduled injury award, even though the injury does not adversely affect the claimant's ability to perform in his former employment. In other words, loss of use established in accordance with prior statutory

---

9. The carrier states:
"The *Dutra, supra,* case is less than clear on this key point: In what way must the compensation be based on claimant's job."

\* \* \* \* \* \*

"Admittedly *Dutra* leaves the law vague in this area."

and decisional law will constitute a minimum basis for the award, which is subject to increase if appropriate evidence is introduced showing an adverse effect on the claimant's ability to perform in his former employment. A contrary interpretation would further eviscerate the relevant statutory provisions. Additionally, in our opinion, evidence relating to a claimant's loss of ability to perform his former employment will be of increased importance in those cases, such as in *Dutra,* in which the American Medical Association guides for rating impairment do not adequately measure the true extent of the impairment. In regard to the effect of the injury on the ability of a claimant to perform tasks of his former employment, consideration should be given to the various physical requirements of the former occupation which claimant can no longer perform as compared to those physical tasks of his former employment in which claimant's ability to perform is unaffected. Thus, the fact that a claimant is no longer able to work at his former employment because of his inability to perform minor, but essential tasks of his former employment, will not mandate a finding of 100% loss of use.

The evaluation of such evidence and the determination of the ultimate percentage of loss of use by the administrative law judge will of necessity involve considerable discretion, but in all cases in which the award varies from the percentage of impairment shown pursuant to a Commission established rating schedule as authorized by A.R.S. § 23–1044(G), the evidence presented relating to the tasks of a claimant's prior employment and the claimant's inability to perform certain tasks must be presented in sufficient detail to enable the administrative law judge to make an informed comparative evaluation thereof.

Applying the foregoing to the award entered in this case, we find that the administrative law judge did not abuse his discretion in concluding that the evidence presented did not justify the entry of an award in excess of the percentage of impairment established pursuant to the guides for rating impairment adopted by the Commission. There was no showing that the guides did not adequately measure the impairment resulting from the industrial injury, and, as indicated by the administrative law judge in his decision, the evidence relating to the effect of the injury on the claimant's ability to perform the tasks of his former employment was not sufficient to enable the administrative law judge to enter an award in an increased amount without engaging in "sheer arbitrary speculation." We agree with the administrative law judge's determination that the entry of an award for a 100% loss of use would not be justified for claimant's 30% knee impairment in this case, particularly in view of the provisions of A.R.S. § 23–1044(B)(20) which state that a 100% loss of use is "the same as a loss of any such member by separation."

The award is affirmed.

BROOKS, J., concurs.

GRANT, J., concurs in the result only.